**E-FILED**
Tuesday, 29 July, 2008  04:06:06 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| GENERAL ELECTRIC CAPITAL BUSINESS ASSET FUNDING CORPORATION OF CONNECTICUT, a Delaware corporation | ) ) ) ) ) |
| Plaintiff, | ) |
| v. | ) ) ) |
| SERIOUS PIZZA, INC., an Illinois Corporation, and PAUL CHILCOTE | ) ) ) |
| Defendants. | ) |

### <u>VERIFIED COMPLAINT</u>

Plaintiff General Electric Capital Business Asset Funding Corporation of Connecticut ("Plaintiff"), as assignee of GE Capital Franchise Finance Corporation, by its undersigned attorneys and for its Complaint against defendants Serious Pizza, Inc. and Paul Chilcote ("Chilcote"), respectfully states as follows:

### NATURE OF THE ACTION

1.      This is an action for breach of contract and replevin arising out of defendant Serious Pizza, Inc.'s breach of a Loan Agreement and defendant Chilcote's breach of a concomitant Guaranty Agreement.  Serious Pizza, Inc. defaulted on its obligations under the Loan Agreement by, among other things, failing to make its required monthly principal and interest payments.  When demand for payment was made on Serious Pizza, Inc., and on Chilcote through his Guaranty, both refused to satisfy their obligations under their respective agreements and thus are in breach of those contracts.  As a consequence of the breaches, Plaintiff is entitled to immediate possession of certain Collateral under the Loan Agreement.  Plaintiff has made

demand for the Collateral, but Serious Pizza, Inc. and Chilcote have refused to turn it over. Accordingly, Plaintiff has brought this suit seeking to recover damages in excess of $1,379,755.52 and the immediate turnover of the Collateral.

## PARTIES

2.      Plaintiff General Electric Capital Business Asset Funding Corporation of Connecticut is a Delaware corporation that does business in Scottsdale, Arizona.

3.      Defendant Serious Pizza, Inc. is an Illinois corporation with a principal place of business in Bloomington, Illinois.

4.      Defendant Paul Chilcote is an individual who resides in Bloomington, Illinois. Chilcote is President of Serious Pizza, Inc.

## JURISDICTION AND VENUE

5.      This Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1).  Plaintiff is a Delaware corporation with its principal place of business in Arizona. Defendants are residents of Illinois.  The amount in controversy exceeds $75,000, exclusive of interest and costs.

6.      Venue is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to the claims occurred in the State of Illinois.

## FACTUAL ALLEGATIONS

7.      On or about July 1, 2005, Serious Pizza, Inc., as borrower, entered into a certain "Equipment Loan and Security Agreement" with GE Capital Franchise Finance Corporation ("Original Lender"), as lender (hereinafter the "Loan Agreement").  A copy of the Loan Agreement is attached hereto as Exhibit A.

8.　　On or about that same date, and as a condition precedent to the execution of the Loan Agreement, Chilcote executed an "Unconditional Guaranty of Payment and Performance (Equipment)" (hereinafter the "Guaranty") personally guarantying the prompt payment and punctual performance when due of Serious Pizza, Inc.'s obligations under the Loan Agreement. A copy of the Guaranty is attached hereto as Exhibit B.

9.　　Under the terms of the Loan Agreement, Original Lender agreed to provide an equipment loan in the amount of $1,600,000 to Serious Pizza, Inc.  In exchange, Serious Pizza, Inc. agreed to, among other things, make monthly principal and interest payments to Original Lender (hereinafter the "Obligations").  In addition, Serious Pizza, Inc. granted Original Lender a security interest in certain equipment and other collateral (the "Collateral") to secure its payment of the Obligations.  Thereafter, Original Lender's interests in the Loan Agreement and Guaranty were assigned to Plaintiff.

10.　　Serious Pizza, Inc. defaulted on its Obligations under the Loan Agreement by, among other things, failing to make its required monthly principal and interest payments.

11.　　On or about June 12, 2008, Plaintiff issued a demand to Serious Pizza, Inc. for the payment of its outstanding monetary Obligations.  Plaintiff further demanded that Chilcote, as Serious Pizza, Inc.'s Guarantor, make immediate payment of Serious Pizza, Inc.'s outstanding monetary Obligations.

12.　　Pursuant to the terms of the Guaranty, Plaintiff may proceed directly against the Guarantor to collect and recover Serious Pizza, Inc.'s Obligations, including, without limitation, all losses, costs, attorneys' fees, and expenses incurred by Plaintiff in connection with Serious Pizza, Inc.'s failure to satisfy its Obligations.

13.    As of the date hereof, the outstanding balance of Serious Pizza, Inc.'s Obligations to Plaintiff under the Loan Agreement was not less than $1,379,755.52, excluding default interest, attorneys' fees, and other related fees and expenses not yet charged.

14.    Pursuant to the Loan Agreement, the failure to pay any sum due constitutes an "Event of Default", which causes all rights and interest in the Collateral to be transferred to Plaintiff. Furthermore, in the event of default, the Loan Agreement provides Plaintiff with "the right to take immediate and exclusive possession of the Collateral, or any part thereof."

15.    On July 11, 2008, Plaintiff issued a demand to Serious Pizza, Inc. and Chilcote to make arrangements for the turnover of the Collateral to Plaintiff. Serious Pizza, Inc. and Chilcote did not respond to Plaintiff's demand and have to date refused to return the Collateral.

16.    Plaintiff has retained its attorneys of record to enforce its claims, rights, and remedies, and has incurred and will continue to incur attorneys' fees and other litigation costs.

## COUNT I
### (BREACH OF THE LOAN AGREEMENT AGAINST SERIOUS PIZZA, INC.)

17.    Plaintiff repeats and hereby incorporates by reference paragraphs 1 through 16 above.

18.    The Loan Agreement constitutes a valid and enforceable contract between Plaintiff and Serious Pizza, Inc.. Plaintiff, or its assignor, has performed all conditions and covenants on its part to be performed pursuant to the Loan Agreement.

19.    Despite Plaintiff's demands for payment, Serious Pizza, Inc. has failed to pay to Plaintiff the aggregate amount of its Obligations due and owing under the Loan Agreement and thus is in breach of the same.

20.     As a result of Serious Pizza, Inc.'s breach of the Loan Agreement, Plaintiff has suffered damages in excess of $1,379,755.52 and has incurred, and continues to incur legal fees, costs, and expenses in an amount to be determined at trial.

**WHEREFORE**, plaintiff General Electric Capital Business Asset Funding Corporation of Connecticut respectfully requests that this Court:

(a)    enter judgment in its favor against Serious Pizza, Inc. in an amount in excess of $1,379,755.52, plus additional sums as they accrue, including attorneys' fees and expenses recoverable under the terms of the Loan Agreement;

(b)    award pre- and post-judgment interest, costs; and

(c)    award any other relief this Court deems just and appropriate.

### COUNT II
### (BREACH OF GUARANTY AGAINST PAUL CHILCOTE)

21.     Plaintiff repeats and hereby incorporates by reference paragraphs 1 through 20 above.

22.     The Guaranty executed by Chilcote constitutes a valid and enforceable contract.

23.     Serious Pizza, Inc. is in breach of the Loan Agreement it entered into with Plaintiff and owes Plaintiff in excess of $1,379,755.52, thus triggering Chilcote's obligations under the Guaranty he executed.

24.     Despite Plaintiff's demands to Chilcote for payment, Chilcote has failed to pay Plaintiff the aggregate amount of Serious Pizza, Inc.'s Obligations and liabilities owing to Plaintiff and thus is in breach of his obligations under the Guaranty.

25.     As a result of the Chilcote's breach of the Guaranty, Plaintiff has suffered damages in excess of $1,379,755.52 and has incurred, and continues to incur legal fees, costs, and expenses in an amount to be determined at trial.

**WHEREFORE**, plaintiff General Electric Capital Business Asset Funding Corporation of Connecticut respectfully requests that this Court:

    (a)    enter judgment in its favor and against Paul Chilcote in an amount in excess of $1,379,755.52, plus additional sums as they accrue, including attorneys' fees and expenses recoverable under the terms of the Loan Agreement and Guaranty;

    (b)    award pre- and post-judgment interest, costs; and

    (c)    award any other relief this Court deems just and appropriate.

## COUNT III
### (REPLEVIN AGAINST SERIOUS PIZZA, INC.)

26.    Plaintiff repeats and hereby incorporates by reference paragraphs 1 through 25 above.

27.    As a result of Serious Pizza, Inc.'s breach of the Loan Agreement, Plaintiff has a possessory interest in the Collateral superior to Superior Pizza.  The Collateral includes, without limitation, all equipment, machinery, furniture, appliances, and trade fixtures, among other things, that are in the possession of Serious Pizza, Inc. at any of the premises identified in Exhibit A to the Loan Agreement.  Plaintiff is lawfully entitled to possession of the Collateral.

28.    The Collateral is being wrongfully detained by Serious Pizza, Inc., despite Plaintiff's demand for surrender of the Collateral.

29.    The Collateral has not been taken for any tax or assessment of fine levied by virtue of any law of this State against the property of Plaintiff, nor seized under any lawful process against the goods and chattels of Plaintiff subject to such lawful process, nor held by virtue of any order for replevin against Plaintiff.

30.    Plaintiff claims the value of the Collateral not delivered to the officer under any order for replevin.

WHEREFORE, plaintiff General Electric Capital Business Asset Funding Corporation of Connecticut respectfully requests that this Court enter an Order for Replevin and for judgment against Serious Pizza, Inc. for the following:

(a)    possession of the Collateral;

(b)    the value of the Collateral not received;

(c)    damages for the detention of the Collateral; and

(d)    award any other relief this Court deems just and appropriate.

Dated: July 29, 2008

GENERAL ELECTRIC CAPITAL BUSINESS ASSET FUNDING CORPORATION OF CONNECTICUT

By:    /s/ William J. Dorsey

One of Its Attorneys

William J. Dorsey
Andrew D. Hoeg (upon admission)
KATTEN MUCHIN ROSENMAN LLP
525 West Monroe Street
Chicago, IL 60661
312-902-5200
Firm I.D. No. 41832

E-FILED
Tuesday, 29 July, 2008  04:06:28 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT A

## EQUIPMENT LOAN AND SECURITY AGREEMENT

This LOAN AND SECURITY AGREEMENT (this "Agreement"), dated as of _7/1/05_ (the "Closing Date") is made by and between **SERIOUS PIZZA, INC.**, an Illinois corporation ("Borrower"), and **GE CAPITAL FRANCHISE FINANCE CORPORATION**, a Delaware corporation ("Lender").

NOW, THEREFORE, in consideration of the premises and the covenants set forth herein, the receipt and sufficiency of which are hereby acknowledged, Borrower and Lender hereby agree as follows:

1.    Transaction; Closing Conditions; Interim and Term Loans. (a) On the terms and subject to the conditions set forth in the Loan Documents (as defined below), Lender shall make an equipment loan to Borrower with respect to the Collateral (as defined below) in the amount of $1,600,000.00 (the "Loan Amount"). Such equipment loan shall be made in the form of an interim equipment loan (the "Interim Loan") evidenced and disbursed in accordance with subsection (c) below, and a term equipment loan evidenced and disbursed in accordance with subsection (d) below (the "Term Loan")(the Interim Loan and the Term Loan are defined collectively as the "Equipment Loan"). The Equipment Loan will be evidenced by the Interim Note and the Term Note (as defined in subsections (c) and (d) below) (the Interim Note and the Term Note are herein sometimes each called an "Equipment Note" and collectively the "Equipment Notes"),this Agreement, such UCC-1 Financing Statements as Lender shall require and the guaranty or guaranties required by the documents described in the following subsection (b), as applicable (such documents, together with all other documents, instruments and agreements executed in connection with, or contemplated by such documents, including the Authorization Regarding Information form previously delivered on behalf of the Borrower to Lender, and any amendments to any thereof collectively, the "Loan Documents"). Borrower shall repay the outstanding principal amount of the Equipment Loan with interest thereon in the manner and in accordance with the terms and conditions of the Equipment Notes and the other Loan Documents. The Equipment Loan shall be advanced in cash or otherwise immediately available funds  subject to any prorations and adjustments required by this Agreement. For purposes of this Agreement, "Collateral" means all equipment, machinery, furniture, appliances, trade fixtures, goods, replacements, substitutions, additions, parts and accessories now owned or hereafter acquired by Borrower and located at the parcel or parcels of real estate described in Exhibit A attached hereto (the "Premises"), including, without limitation, fryers, grills, ovens, warmers, refrigerators, freezers, waste disposal units, dishwashers, beverage dispensers, ice cream makers, racks, display cases, light fixtures, decor, counters, cash registers, salad equipment, tables, seating, signs and similar property of Borrower, together with the proceeds thereof and income therefrom.

(b)    The obligation of Lender to consummate the transaction contemplated by this Agreement is subject to the fulfillment or waiver of each of the conditions contained in the loan commitment issued by Lender to Borrower with respect to the Equipment Loan and the "Loan Closing Checklist" prepared by Lender with respect to the Equipment Loan.

(c)    The Interim Loan in an amount up to the Loan Amount shall be disbursed by Lender to Borrower or at Borrower's direction in up to six (6) partial advances made at the request of Borrower, subject to the satisfaction of the applicable conditions contemplated by the preceding subsection (b) and this subsection (c). The Interim Loan shall be evidenced by and repayable with interest in accordance with an interim equipment promissory note dated as of the date of this Agreement executed by Borrower and payable to the order of Lender in the Loan Amount (the "Interim Note"). Borrower shall give Lender at least ten (10) days' notice, in the form of a request for the advance of loan proceeds (the "Request"), specifying the date on which any portion of the Interim Loan is to be borrowed. Each Request shall be accompanied by an original copy of the invoice or invoices for the Collateral to be acquired with such proceeds. Such notice shall constitute a representation and warranty by Borrower that as of the date of the notice, no Event of Default (as defined in Section 12) or event that, with the lapse of time or the giving of notice or both, would constitute an Event of Default, has occurred and is continuing. Lender shall have no obligation to advance any portion of the Interim Loan if an Event of Default shall have occurred and be continuing. No Request shall be delivered to Lender after the fifth day preceding the Outside Funding Date (as defined below) and Lender shall have no obligation to disburse any portion of the Interim Loan after the Outside Funding Date. Lender will disburse the Interim Loan proceeds to the invoicing parties,

Contract No. 28039
Property No.

1

or if Borrower shall have paid the amount of any such invoice, Lender shall reimburse Borrower for such portion of the Loan Amount upon receipt from Borrower of proof of payment satisfactory to Lender. The outstanding amount of the Interim Loan set forth in Lender's records (which may include computer records) shall be prima facie evidence of the principal amount due and owing to Lender under the Interim Note. The Interim Loan shall be due and payable on the earlier of October 14, 2005 (the "Outside Funding Date") and the Final Funding Date (as defined in the following subsection (d)), provided, that, if all of the conditions to Lender making the Term Loan are satisfied on or before such due date, Borrower may, in lieu of paying Lender the outstanding principal amount of the Interim Note and all accrued but unpaid interest thereunder (the "Outstanding Interim Loan Amount") in immediately available funds, repay such amounts by crediting the Outstanding Interim Loan Amount against the amount of the Term Loan.

(d)    The Term Loan in the Loan Amount shall be made by Lender to Borrower, subject to the satisfaction of the applicable conditions contemplated by the preceding subsection (b) and this subsection (d), but in no event later than the Outside Funding Date. Lender shall have no obligation to advance the Term Loan if an Event of Default shall have occurred and be continuing. The Term Loan shall be evidenced by and repayable with interest in accordance with the terms of an equipment promissory note (the "Term Note"), dated as of the date on which the remaining undisbursed portion of the Term Loan is disbursed by Lender to Borrower (the "Final Funding Date"). The Term Note shall be executed by Borrower and payable to the order of Lender. If Borrower elects to credit the Outstanding Interim Loan Amount against the amount of the Term Loan, the amount of the Term Loan advanced to Borrower in cash on the Final Funding Date shall be reduced by the Outstanding Interim Loan Amount.

2.    Security Interest Created; Obligations Secured.  (a) Borrower hereby grants to Lender a security interest in the Collateral to secure the payment of the following indebtedness and obligations (the "Obligations"): (i) payment of indebtedness evidenced by the Equipment Notes, together with all extensions, renewals, amendments and modifications thereof; and (ii) payment of all other indebtedness and other sums, including interest at the applicable rate, which may be owed under, and performance of all other obligations and covenants contained in, any other Loan Document or any Other Agreement (as defined below), together with any other instrument given to evidence or further secure the payment and performance of any obligation secured hereby or thereby.

For purposes of this Agreement, the term "Affiliate" means any individual, corporation, partnership, limited liability company, trust, unincorporated organization, Governmental Authority (as defined in Section 3 (c) below) or any other form of entity ("Person") which directly or indirectly controls, is under common control with, or is controlled by any other Person. For purposes of this definition, "controls", "under common control with" and "controlled by" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities or otherwise; and "Other Agreements" means, collectively, all agreements and instruments between, among or by (A) any of Borrower and any guarantor of the Obligations (collectively, the "Borrower Parties") or any Affiliate of any of the Borrower Parties (including any Affiliate of any predecessor-in-interest to any of the Borrower Parties), and, or for the benefit of, (B) any of Lender (including any predecessor-in-interest to Lender) and any Affiliate of Lender (including any Affiliate of any predecessor-in-interest to Lender), including, without limitation, promissory notes and guaranties; provided, however, the term "Other Agreements" shall not include the agreements and instruments defined as the Loan Documents.

(b)    Borrower authorizes Lender to file financing statements with respect to the security interest of Lender, continuation statements with respect thereto, and any amendments to such financing statements that may be necessitated by reason of any of the changes described in Section 13. Borrower agrees that, notwithstanding any provision in the Uniform Commercial Code as adopted in the State of Arizona (the "UCC") to the contrary, Borrower shall not file a termination statement of any financing statement filed by Lender in connection with any security interest granted under this Agreement if Lender reasonably objects to the filing of such termination statement.

(c)    Lender shall at all times have a perfected security interest in the Collateral that shall be prior to any other interests therein. Borrower shall do all acts and things, shall execute and file all

instruments (including security agreements, UCC financing statements, continuation statements, etc.) requested by Lender to establish, maintain and continue the perfected security interest of Lender in the Collateral, and shall promptly on demand pay all costs and expenses of (i) filing and recording, including the costs of any searches deemed necessary by Lender from time to time to establish and determine the validity and the continuing priority of the security interest of Lender, and (ii) all other claims and charges that in the reasonable opinion of Lender might prejudice, imperil or otherwise affect the Collateral or security interest therein of Lender. Borrower agrees that a carbon, photographic or other reproduction of a security agreement or financing statement shall be sufficient as a financing statement. Lender is hereby irrevocably appointed Borrower's attorney-in-fact to take any of the foregoing actions requested of Borrower by Lender if Borrower should fail to take such actions, which appointment shall be deemed coupled with an interest.

3.    Borrower's Representations and Warranties.  Borrower represents and warrants to Lender as of the date of this Agreement and the Final Funding Date as follows:

(a) All financial statements and other information concerning the Borrower Parties delivered to Lender by Borrower in connection with the transaction described in this Agreement (collectively, the "Financial Information") are true, correct and complete in all material respects; there have been no amendments to the Financial Information since the date such Financial Information was prepared or delivered to Lender; and Borrower understands that Lender is relying upon the Financial Information and Borrower represents that such reliance is reasonable. All financial statements included in the Financial Information were prepared in accordance with generally accepted accounting principles consistently applied ("GAAP") and fairly present as of the date of such financial statements the financial condition of each individual or entity to which they pertain. No change has occurred with respect to the financial condition of any of the Borrower Parties or the Collateral as reflected in the Financial Information which has not been disclosed in writing to Lender or has had, or could reasonably be expected to result in, a material adverse effect on (i) the Collateral, including without limitation, the use of the Collateral in the operation of a Domino's Pizza (the "Permitted Concept"), or (ii) Borrower's ability to perform its obligations under the Loan Documents ("Material Adverse Effect").

(b) Each of the Borrower Parties (other than individuals), as applicable, is duly organized or formed, validly existing and in good standing under the laws of its state of incorporation or formation, Borrower is qualified as a foreign corporation, partnership or limited liability company, as applicable, to do business in the state(s) where the Collateral is located, and each of the Borrower Parties is qualified as a foreign corporation, partnership or limited liability company, as applicable, to do business in any other jurisdiction where the failure to be qualified would reasonably be expected to result in a Material Adverse Effect. All necessary action has been taken to authorize the execution, delivery and performance by the Borrower Parties of this Agreement and the other Loan Documents. The person(s) who have executed this Agreement on behalf of the Borrower are duly authorized so to do. Borrower is not a "foreign corporation", "foreign partnership", "foreign trust", "foreign estate" or "foreign person" (as those terms are defined by the Internal Revenue Code of 1986, as amended).

(c) Upon execution by the Borrower Parties, this Agreement and the other Loan Documents shall constitute the legal, valid and binding obligations of the Borrower Parties, respectively, enforceable against the Borrower Parties in accordance with their respective terms. There are no suits, actions, proceedings or investigations pending, or to the best of its knowledge, threatened against or involving the Borrower Parties, the Collateral or the Premises before any arbitrator or any governmental authority, agency, department, commission, bureau, board, instrumentality, court or quasi-governmental authority having jurisdiction or supervisory or regulatory authority over the Collateral or any of the Borrower Parties ("Governmental Authority"), except for such suits, actions, proceedings or investigations which, individually or in the aggregate, have not had, and could not reasonably be expected to result in, a Material Adverse Effect. The Borrower Parties are not, and the authorization, execution, delivery and performance of this Agreement and the other Loan Documents will not result, in any breach or default under any other document, instrument or agreement to which any of the Borrower Parties is a party or by which any of the Borrower Parties, the Premises, the Collateral or any of the property of any of the Borrower Parties is subject or bound, except for such breaches or defaults which, individually or in the

Contract No. 28039
Property No.

3

aggregate, have not had, and could not reasonably be expected to result in, a Material Adverse Effect. The authorization, execution, delivery and performance of this Agreement and the other Loan Documents will not violate any applicable law, statute, regulation, rule, ordinance, code, rule or order. The Collateral is not subject to any right of first refusal, right of first offer or option to purchase or lease granted to a third party.

4.      Use.  Borrower agrees that the Collateral will be used at the Premises solely in the conduct of Borrower's business as a Permitted Concept and will at all times remain in the possession and control of Borrower at the Premises and will not be removed without Lender's prior written consent.  Borrower promises that the Collateral at all times will be used and operated under and in compliance with all applicable statutes, regulations, rules, ordinances, codes, licenses, permits, orders and approvals of each Governmental Authority having jurisdiction over the Collateral, and all policies or rules of common law, in each case, as amended, and any judicial or administrative interpretation thereof, including any judicial order, consent, decree or judgment applicable to any of the Borrower Parties, except for such noncompliance which will not have, and will not reasonably be expected to have, a Material Adverse Effect.  Borrower will not permit any Collateral to be subject to any lien, charge or encumbrance except that of Lender and will keep the Collateral free and clear of any and all liens, charges, encumbrances, and adverse claims.  Borrower will not sell, lease, rent, or otherwise dispose of any item of Collateral without the prior written consent of Lender.

5.      Maintenance and Improvement.  Borrower shall at all times, at its own expense, keep the Collateral in good and efficient working order, condition and repair and well maintained, ordinary wear and tear excepted, and shall make all inspections and repairs required by law, regulation or insurance policy.  Borrower shall also make any alterations, improvements or additions to the Collateral that are required by law or regulation.  Any alterations, improvements, or additions to the Collateral shall be made at the expense of Borrower, shall constitute accessions to the Collateral and shall be subject to Lender's security interest.

6.      Loss and Damage.  Borrower shall bear the risk of damage, loss, theft, or destruction, partial or complete, of the Collateral from whatsoever source arising, whether or not such loss or damage is covered by insurance.  Borrower shall promptly notify Lender in writing in the event of any damage, loss, theft, or destruction, partial or complete, of any item of Collateral.  While no Event of Default shall have occurred and be continuing, Lender agrees to apply insurance proceeds payable to Lender by reason of any such damage, loss, theft, or destruction, at the option of Lender, to (a) repair or restore the Collateral to good condition and working order, (b) replace the Collateral with similar equipment in good repair, condition and working order, or (c) pay Lender, in cash, an amount equal to the unamortized cost for that item and all other amounts then due and owing under this Agreement, and upon payment of that amount, this Agreement shall terminate with respect to that item only, and Lender will release its interest in that item; provided, however, such release shall not limit or effect in any manner the amounts otherwise payable by Borrower to Lender under the Loan Documents.  Upon the occurrence and during the continuance of an Event of Default, Lender shall have the right to apply the insurance proceeds from any damage, loss, theft or destruction to any item of Collateral toward the Obligations in such order, priority and proportions as Lender shall determine or pay such proceeds in whole or in part to Borrower to be applied toward repair, restoration or replacement of the Collateral as contemplated by the preceding subitems (a) and (b) of this Section 6.

7.      Insurance.  Borrower shall procure and continuously maintain and pay for (a) all risk physical damage insurance covering loss or damage to the Collateral for not less than the full replacement value thereof naming Lender as additional insured and loss payee,  (b) bodily injury and property damage combined single limit liability insurance in an amount not less than Two Million Dollars ($2,000,000) for each location at which any of the Collateral is located, and (c) such other insurance as may from time to time be reasonably required by Lender in order to protect its interests with respect to the Collateral, with such insurance companies and pursuant to such contracts or policies and with such deductibles as are satisfactory to Lender.  All contracts and policies shall include provisions for the protection of Lender notwithstanding any act or neglect of or breach or default by Borrower, shall provide for payment of

Contract No. 28039
Property No.

4

insurance proceeds to Lender, shall provide that they may not be modified, terminated or canceled unless Lender is given at least thirty (30) days' advance written notice thereof, and shall provide that the coverage is "primary coverage" for the protection of Borrower or Lender notwithstanding any other coverage carried by Lender or Borrower protecting against similar risks. Borrower shall promptly notify any appropriate insurer and Lender of each and every occurrence that may become the basis of a claim or cause of action against the insured and provide Lender with all data pertinent to such occurrence. Borrower shall furnish Lender with certificates of such insurance or copies of policies upon request and shall furnish Lender with renewal certificates not less than thirty (30) days prior to the renewal date. Proceeds of all insurance are payable first to Lender to the extent of its interest. Insurance must be issued by insurance companies licensed to do business in the state in which the Premises is located and which are rated A:VIII or better by Best's Key Rating Guide or otherwise approved by Lender. All policies shall be written as primary policies, with deductibles not to exceed $10,000.

8.    <u>Taxes</u>. Borrower agrees to pay all taxes, assessments and other governmental charges of whatsoever kind and character by whom payable on or relating to any item of Collateral or the sale, ownership, use, shipment, transportation, delivery or operation thereof or payable in respect to any obligation of Borrower. Upon receipt of a request therefor from Lender, Borrower will submit written evidence of payment of the obligations described in this section.

9.    <u>Financial Data</u>. Within 45 days after the end of each fiscal quarter and within 120 days after the end of each fiscal year of Borrower, Borrower shall deliver to Lender (a) complete financial statements of the Borrower Parties including a balance sheet, profit and loss statement, statement of cash flows and all other related schedules for the fiscal period then ended; (b) income statements for the business at the Premises; and (c) such other financial information as Lender may reasonably request in order to establish compliance with the financial covenants in the Loan Documents, as applicable. All such financial statements and information shall be prepared in accordance with GAAP from period to period, and shall be certified to be accurate and complete by Borrower (or the Treasurer or other appropriate officer of Borrower). Borrower understands that Lender is relying upon such financial statements and Borrower represents that such reliance is reasonable. The financial statements delivered to Lender need not be audited, but Borrower shall deliver to Lender copies of any audited financial statements of Borrower that may be prepared, as soon as they are available. Borrower shall also provide Lender with personal financial statements and tax returns of any guarantor on an annual basis within ninety (90) days after the close of each calendar year, and such information concerning its business as Lender may reasonably request.

10.    <u>General Indemnity</u>. Borrower shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless each of the Indemnified Parties (as defined below) for, from and against any and all claims, suits, liabilities (including, without limitation, strict liabilities), actions, proceedings, obligations, debts, damages, losses, costs, expenses, diminutions in value, fines, penalties, charges, fees, expenses, judgments, awards, amounts paid in settlement and damages of whatever kind or nature (including, without limitation, attorneys' fees, court costs and other costs of defense) (collectively, "Losses") (excluding Losses suffered by an Indemnified Party directly arising out of such Indemnified Party's gross negligence or willful misconduct; provided, however, that the term "gross negligence" shall not include gross negligence imputed as a matter of law to any of the Indemnified Parties solely by reason of Borrower's interest in the Collateral or Borrower's failure to act in respect of matters which are or were the obligation of Borrower under the Loan Documents) caused by, incurred or resulting from Borrower's operations of or relating in any manner to the Collateral or the Premises, whether relating to their original design or construction, latent defects, alteration, maintenance, use by Borrower or any person thereon, supervision or otherwise, or from any breach of, default under, or failure to perform, any term or provision of this Agreement by Borrower, its officers, employees, agents or other persons, including, without limitation, Losses arising from (a) any accident, injury to or death of any person or loss of or damage to property occurring in connection with the Collateral or the Premises or any portion thereof, (b) any use, non-use or condition in, on or about, or possession, alteration, repair, operation, maintenance or management of, the Collateral or the Premises or any portion thereof or the sidewalks, curbs, parking areas, streets or ways adjoining the Premises, (c) any representation or warranty made herein by Borrower, in any certificate delivered in connection herewith or in any other agreement to which

Contract No. 28039
Property No.

Borrower is a party or pursuant thereto being false or misleading in any material respect as of the date such representation or warranty was made, (d) performance of any labor or services or the furnishing of any materials or other property in respect to the Collateral or the Premises or any portion thereof, (e) any taxes, assessments or other charges which Borrower is required to pay under Section 8, (f) any lien, encumbrance or claim arising on or against the Collateral or the Premises or any portion thereof under any applicable regulation or otherwise which Borrower is obligated hereunder to remove and discharge, or the failure to comply with any applicable regulation, (g) the claims of any licensees, tenants or other occupants of all or any portion of the Collateral or the Premises or any Person acting through or under Borrower or otherwise acting under or as a consequence of this Agreement or any sublease, (h) any act or omission of Borrower or its agents, contractors, licensees, subtenants or invitees and (i) any disclosures of information, financial or otherwise, (A) made by (1) Lender or Lender's employees, officers, agents and designees to Franchisor (as hereinafter defined) or any third party as contemplated by Section 26 of this Agreement, or (2) any employee, officer, agent or representative of Franchisor to Lender or any other Indemnified Party, or (B) obtained from any credit reporting agency with respect to Borrower, any guarantor of the Equipment Loan, any Affiliate of Borrower, any of the other Borrower Parties or any operator or lessee of the Premises. It is expressly understood and agreed that Borrower's obligations under this Section shall survive the expiration or earlier termination of this Agreement for any reason. The term "Indemnified Parties" means Lender and its directors, officers, shareholders, trustees, beneficial owners, partners and members, any directors, officers, shareholders, trustees, beneficial owners, partners, members of any shareholders, beneficial owners, partners or members of Lender, and all employees, agents, servants, representatives, contractors, subcontractors, affiliates, subsidiaries, participants, successors and assigns of any of the foregoing, including, but not limited to, any successors by merger, consolidation or acquisition of all or a substantial portion of the assets and business of Lender.

11.    Actions by Lender; Lost Note. (a) Borrower agrees that Lender may, at its option, and without any obligation to do so, pay, perform, and discharge any and all amounts, costs, expenses and liabilities that are the responsibility of Borrower under the Loan Documents if Borrower fails to timely pay, perform or discharge the same, and all amounts expended by Lender in so doing or in respect of or in connection with the Collateral shall become part of the obligations secured by the Loan Documents and shall be immediately due and payable by Borrower to Lender upon demand therefor and shall bear interest at the Default Rate (as defined in the Equipment Note).

        (b)    Borrower agrees that the Loan Documents shall remain in full effect, without waiver or surrender of any of Lender's rights there under, notwithstanding the occurrence of any one or more of the following: (i) extension of the time of payment of the whole or any part of the Equipment Note; (ii) any change in the terms and conditions of the Equipment Note; (iii) substitution of any other evidence of indebtedness for the Equipment Note; (iv) acceptance by Lender of any collateral or security of any kind for the payment of the Equipment Note; (v) surrender, release, exchange or alteration of any Collateral, collateral or other security, either in whole or in part; or (vi) release, settlement, discharge, compromise, change or amendment, in whole or in part, of any claim of Lender against Borrower or of any claim against any guarantor or other party secondarily or additionally liable for the payment of the Equipment Note.

        (c)    Borrower shall, if the Equipment Note is mutilated, destroyed, lost or stolen (a "Lost Note"), promptly deliver to Lender, upon receipt from Lender of an affidavit and indemnity in a form reasonably acceptable to Lender and Borrower stipulating that the Equipment Note has been mutilated, destroyed, lost or stolen, in substitution therefor, a new promissory note containing the same terms and conditions as the Lost Note with a notation thereon of the unpaid principal and accrued and unpaid interest. Borrower shall provide 15 days' prior notice to Lender before making any payments to third parties in connection with a Lost Note.

12.    Events of Default and Remedies. (a) Each of the following shall be deemed an event of default by Borrower (each, an "Event of Default"):

Contract No. 28039
Property No.

6

(i)    If any representation or warranty of any of the Borrower Parties set forth in any of the Loan Documents is false in any material respect or if any of the Borrower Parties renders any statement or account that is false in any material respect.

(ii)    If any principal, interest or other monetary sum due under the Equipment Note or any other Loan Document is not paid within five days after the date when due; provided, however, notwithstanding the occurrence of such an Event of Default, Lender shall not be entitled to exercise its rights and remedies set forth below unless and until Lender shall have given Borrower notice thereof and a period of five days from the delivery of such notice shall have elapsed without such Event of Default being cured.

(iii)    If Borrower fails to observe or perform any of the other covenants, conditions, or obligations of this Agreement; provided, however, if any such failure does not involve the payment of any monetary sum, is not willful or intentional, does not place any rights or interest in collateral of Lender in immediate jeopardy, and is within the reasonable power of Borrower to promptly cure after receipt of notice thereof, all as determined by Lender in its reasonable discretion, then such failure shall not constitute an Event of Default hereunder, unless otherwise expressly provided herein, unless and until Lender shall have given Borrower notice thereof and a period of 30 days shall have elapsed, during which period Borrower may correct or cure such failure, upon failure of which an Event of Default shall be deemed to have occurred hereunder without further notice or demand of any kind being required. If such failure cannot reasonably be cured within such 30-day period, as determined by Lender in its reasonable discretion, and Borrower is diligently pursuing a cure of such failure, then Borrower shall have a reasonable period to cure such failure beyond such 30-day period, which shall not exceed 90 days after receiving notice of the failure from Lender. If Borrower shall fail to correct or cure such failure within such 90-day period, an Event of Default shall be deemed to have occurred hereunder without further notice or demand of any kind being required.

(iv)    If any of the Borrower Parties becomes insolvent within the meaning of Title 11 of the United States Code, 11 U.S.C. Sec. 101 *et seq.*, as amended (the "Code"), files or notifies Lender that it intends to file a petition under the Code, initiates a proceeding under any similar law or statute relating to bankruptcy, insolvency, reorganization, winding up or adjustment of debts (collectively, an "Action"), becomes the subject of either a petition under the Code or an Action, or is not generally paying its debts as the same become due.

(v)    If there is an "Event of Default" or a breach or default, after the passage of all applicable notice and cure or grace periods, under any other Loan Document or any of the Other Agreements.

(vi)    If there is a default or event of default under any lease agreement with respect to the Premises to which Borrower is a party, or if Borrower receives a notice of default with respect to any such lease and fails to provide a contemporaneous copy thereof to Lender.

(vii)    If a final, nonappealable judgment is rendered by a court against any of the Borrower Parties which (A) has a material adverse effect on the operation of the Premises as a Permitted Concept, or (B) is in an amount greater than $100,000.00 and not covered by insurance, and, in either case, is not discharged or provision made for such discharge within 60 days from the date of entry of such judgment.

(b)    Upon the occurrence and during the continuance of an Event of Default, subject to the limitations set forth in subsection (a), Lender shall have all rights and remedies of a secured party in, to and against the Collateral granted by the UCC and otherwise available at law or in equity, including, without limitation: (i) the right to declare any or all payments due under the Equipment Notes, the other Loan Documents, the Other Agreements and all other documents evidencing the Obligations immediately due and payable without any presentment, demand, protest or notice of any kind, except as otherwise expressly provided herein, and Borrower hereby waives notice of intent to accelerate the Obligations and

Contract No. 28039
Property No.

7

notice of acceleration; (ii) the right to recover all fees and expenses (including reasonable attorney fees) in connection with the collection or enforcement of the Obligations, which fees and expenses shall constitute additional Obligations of Borrower hereunder; (iii) the right to act as, and Borrower hereby constitutes and appoints Lender, Borrower's true, lawful and irrevocable attorney-in-fact (which appointment shall be deemed coupled with an interest) to demand, receive and enforce payments and to give receipts, releases, satisfaction for and to sue for moneys payable to Borrower under or with respect to any of the Collateral, and actions taken pursuant to this appointment may be taken either in the name of Borrower or in the name of Lender with the same force and effect as if this appointment had not been made; (iv) the right to take immediate and exclusive possession of the Collateral, or any part thereof, and for that purpose, with or without judicial process and notice to the Borrower, enter (if this can be done without breach of the peace) upon any premises on which the Collateral or any part thereof may be situated and remove the same there from (provided that if the Collateral is affixed to real estate, such removal shall be subject to the conditions stated in the UCC); (v) the right to hold, maintain, preserve and prepare the Collateral for sale, until disposed of; (vi) the right to render the Collateral unusable and dispose of the Collateral; (vii) the right to require Borrower to assemble and package the Collateral and make it available to Lender for its possession at a place to be designated by Lender which is reasonably convenient to Lender; (viii) the right to sell, lease, hold or otherwise dispose of all or any part of the Collateral; and (ix) the right to sue for specific performance of any Obligations or to recover damages for breach thereof.

Lender shall be entitled to receive on demand, as additional Obligations hereunder, interest accruing at the Default Rate on all amounts not paid when due under the Equipment Notes or this Agreement until the date of actual payment. Lender shall have no duty to mitigate any loss to Borrower occasioned by enforcement of any remedy hereunder and shall have no duty of any kind to any subordinated creditor of Borrower. Neither the acceptance of this Agreement nor its enforcement shall prejudice or in any manner affect Lender's right to realize upon or enforce any other security now or hereafter held by Lender, it being agreed that Lender shall be entitled to enforce this Agreement and any other security now or hereafter held by Lender in such order and manner as it may in its absolute discretion determine. No remedy herein conferred upon or reserved to Lender is intended to be exclusive of any other remedy given hereunder or now or hereafter existing at law or in equity or by statute. Every power or remedy given by any of the Loan Documents to Lender, or to which Lender may be otherwise entitled, may be exercised, concurrently or independently, from time to time and as often as may be deemed expedient by Lender.

(c)     Should Lender exercise the rights and remedies specified in the preceding subsection (b), any proceeds received thereby shall be first applied to pay the costs and expenses, including reasonable attorneys' fees, incurred by Lender as a result of the Event of Default. The remainder of any proceeds, after payment of Lender's costs and expenses, shall be applied to the satisfaction of the Obligations and any excess paid over to Borrower.

(d)     Until an Event of Default shall occur, Borrower may retain possession of the Collateral and may use it in any lawful manner not inconsistent with this Agreement, with the provisions of any policies of insurance thereon or the other Loan Documents.

13.     Franchise Agreements; Sales, Transfers, Assignments and Pledges.  (a) The expiration, revocation, or other termination of the Franchise Agreement, or the sale or other transfer of the franchise described in the Franchise Agreement without Lender's prior written consent, shall, at Lender's option, constitute an Event of Default hereunder, and Lender may invoke any remedies permitted under Section 12 of this Agreement. The consent to any such sale or transfer shall be in Lender's sole discretion, and shall be subject to the execution by the purchaser or transferee, prior to such sale or transfer, of a written assumption agreement containing such terms as Lender may require. In addition, any such consent shall be conditioned upon payment by Borrower to Lender of (i) a fee equal to one percent (1%) of the then outstanding principal balance of the Equipment Notes and (ii) all out-of-pocket costs and expenses incurred by Lender in connection with such consent, including, without limitation, reasonable attorneys' fees. For purposes of this Agreement, the term "Franchise Agreement" means, collectively, the franchise,

Contract No. 28039
Property No.

8

license or area development agreements with Franchisor for the conduct of business at the Premises as a Permitted Concept, together with all amendments, modifications and supplements thereto; and "Franchisor" means Domino's Pizza, LLC, and its successors.

(b)    Borrower agrees that Borrower shall not, without the prior written consent of Lender, sell, convey, mortgage, grant, bargain, encumber, pledge, assign, or otherwise transfer the Collateral or any part thereof or permit the Collateral or any part thereof to be sold, conveyed, mortgaged, granted, bargained, encumbered, pledged, assigned, or otherwise transferred, other than replacements consented to by Lender. A sale, conveyance, mortgage, grant, bargain, encumbrance, pledge, assignment, or transfer within the meaning of this Section shall be deemed to include, but not limited to, (i) an installment sales agreement wherein Borrower agrees to sell the Collateral or any part thereof for a price to be paid in installments; (ii) an agreement by Borrower leasing all or any part of the Collateral; (iii) if any of the Borrower Parties or any general or limited partner or member of any of the Borrower Parties is a corporation, any merger by or with such corporation, or the voluntary or involuntary sale, conveyance, transfer or pledge of such corporation's stock (or the stock of any corporation directly or indirectly controlling such corporation by operation of law or otherwise), or the creation or issuance of new stock, by which an aggregate of more than forty nine percent (49%) of such corporation's stock shall be vested in a party or parties who are not now stockholders; (iv) if any of the Borrower Parties or any general or limited partner or any member of any of the Borrower Parties is a limited or general partnership or joint venture, the change, removal or resignation of a general partner, limited partner or managing partner or the transfer or pledge of the partnership interest of any general partner, limited partner or managing partner or any profits or proceeds relating to such partnership interest; and (v) if any of the Borrower Parties or any general or limited partner or member of any of the Borrower Parties is a limited liability company, the change, removal or resignation of a managing member or the transfer or pledge of the membership interest of any member or any profits or proceeds relating to such membership interest. Notwithstanding the foregoing, a transfer by devise or descent or by operation of law upon the death of a member, partner or stockholder of any of the Borrower Parties or any general or limited partner or member thereof shall not be deemed to be a sale, conveyance, mortgage, grant, bargain, encumbrance, pledge, assignment, or transfer within the meaning of this Section.

Lender's consent to any matter contemplated by this Section shall be subject to the satisfaction of such conditions as Lender shall determine in its sole discretion, including, without limitation, (1) the execution and delivery of such modifications to the terms of the Loan Documents as Lender shall request, and (2) the proposed transferee having agreed to comply with all of the terms and conditions of the Loan Documents (including any modifications requested by Lender pursuant to clause (1) above). In addition, any such consent shall be conditioned upon payment by Borrower to Lender of (x) a fee equal to one percent (1%) of the then outstanding principal balance of the Equipment Note and (y) all out-of-pocket costs and expenses incurred by Lender in connection with such consent, including, without limitation, reasonable attorneys' fees. Lender shall not be required to demonstrate any actual impairment of its security or any increased risk of default hereunder in order to declare the Obligations immediately due and payable upon Borrower's sale, conveyance, mortgage, grant, bargain, encumbrance, pledge, assignment, or transfer as contemplated by this Section. The provisions of this Section shall apply to every such sale, conveyance, mortgage, grant, bargain, encumbrance, pledge, assignment, or transfer regardless of whether voluntary or not, or whether or not Lender has consented to any previous sale, conveyance, mortgage, grant, bargain, encumbrance, pledge, assignment, or transfer pursuant to this Section.

14.    Inspection. Borrower shall, during normal business hours (or at any time in the event of an emergency), (a) provide Lender and Lender's officers, employees, agents and advisors with access to the Collateral and all files, correspondence and documents relating to the Collateral (including, without limitation, any of the foregoing information stored in any computer files), and (b) allow such persons to make such inspections, tests, copies, and verifications as Lender considers necessary. Inspections conducted by Lender shall be for its own benefit and shall not be relied on by Borrower or any third parties.

Contract No. 28039
Property No.

15.     Personal Property.  No item of Collateral will be attached or affixed to realty or any building without Lender's prior knowledge and the written consent and waiver, in form and substance acceptable to Lender, of the landlord and the mortgagee, if any, of the real property to which the Collateral is proposed to be attached or affixed.

16.     Notices.  Except for any notice required under applicable law to be given in another manner, any notices required under this Agreement or any of the other Loan Documents shall be in writing and shall be given by mailing such notice by certified mail or by sending such notice by Federal Express or other nationally recognized courier, addressed to Lender at: 17207 North Perimeter Drive, Scottsdale, Arizona 85255, Attn: General Counsel and to Borrower at: Serious Pizza, Inc., 305 West Beaufort, Normal, IL 61761, Attention: Paul Chilcote, President,   or to such other address as either party may from time to time specify in writing to the other.  Notices so mailed or sent shall be deemed given on the date shown on the return receipt or courier's records as the date of delivery or first attempted delivery.

17.     Further Instruments; Document Review.  From time to time, Borrower will execute such further instruments as Lender may reasonably require in order to protect, preserve and maintain rights and remedies set forth in this Agreement and the other Loan Documents, including, without limitation, the security interest granted in connection herewith.  In the event Borrower makes any request upon Lender requiring Lender or Lender's attorneys to review or prepare (or cause to be reviewed or prepared) any documents or other submissions in connection with or arising out of this Agreement or any of the other Loan Documents, then Borrower shall (a) reimburse Lender promptly upon Lender's demand for all out-of-pocket costs and expenses incurred by Lender in connection with such review or preparation, including, without limitation, reasonable attorneys' fees, and (b) pay Lender a reasonable processing and review fee.

18.     Authorization to Insert; Estoppel Certificates.  Borrower authorizes Lender to insert in the spaces provided in the Loan Documents, as applicable, dates, models, serial numbers, loan numbers and other pertinent data relative to the proper identification of Borrower, the Collateral or this Equipment Loan.  At any time, and from time to time, each party agrees, promptly and in no event later than 15 days after a written request from the other party, to execute, acknowledge and deliver to the other party a certificate in the form supplied by the other party, certifying as to such information reasonably requested by the other party in connection with this Agreement and the other Loan Documents.

19.     Survival.  All representations, warranties, covenants, and agreements of Borrower shall survive the execution and delivery of this Agreement or any other agreements or documents executed in connection herewith, and the performance of this Agreement.

20.     Assignment By Lender; Binding Effect.  Lender may assign in whole or in part its rights under this Agreement.  Upon any unconditional assignment of Lender's entire right and interest hereunder, Lender shall automatically be relieved, from and after the date of such assignment, of liability for the performance of any obligation of Lender contained herein.  This Agreement and the other Loan Documents shall be binding upon and inure to the benefit of Borrower and Lender and their respective successors and permitted assigns, including, without limitation, any United States trustee, any debtor in possession or any trustee appointed from a private panel.  Notwithstanding anything to the contrary provided in this Agreement or the other Loan Documents, it is specifically understood and agreed, such agreement being a primary consideration for the execution of this Agreement and the other Loan Documents by Lender, that (a) there shall be absolutely no personal liability on the part of any shareholder, director, officer or employee of Lender, with respect to any of the terms, covenants and conditions of this Agreement or the other Loan Documents, (b) Borrower waives all claims, demands and causes of action against Lender's officers, directors, employees and agents in the event of any breach by Lender of any of the terms, covenants and conditions of this Agreement or the other Loan Documents to be performed by Lender and (c) Borrower shall look solely to the assets of Lender for the satisfaction of each and every remedy of Borrower in the event of any breach by Lender of any of the terms, covenants and conditions of this Agreement or the other Loan Documents to be performed by Lender, such exculpation of liability to be absolute and without any exception whatsoever.

Contract No. 28039
Property No.

10

21.    Joint and Several; Severability. The obligations of all Borrowers hereunder shall be both joint and several. The provisions of this Agreement and the other Loan Documents shall be deemed severable. If any part of this Agreement or the other Loan Documents shall be held invalid, illegal or unenforceable, the remainder shall remain in full force and effect, and such invalid, illegal or unenforceable provision shall be reformed by such court so as to give maximum legal effect to the intention of the parties as expressed therein. This Agreement and the other Loan Documents may be executed in one or more counterparts, each of which shall be deemed an original.

22.    Non-Waiver; Attorney's Fees. This Agreement, the Equipment Notes and the other Loan Documents comprise the entire agreement between Lender and Borrower with respect to the Collateral, and any amendments thereto shall only be in a writing executed by both parties. No delay or failure by Lender shall constitute a waiver or otherwise affect or impair any right, power or remedy available to Lender nor shall any waiver or indulgence by Lender or any partial or single exercise of any right, power or remedy preclude any other or further exercise thereof. The exercise of any right, power or remedy shall in no event constitute a waiver or cure of any default under this Agreement or prejudice Lender in the exercise of any right hereunder unless in the exercise of such right all obligations of Borrower under this Agreement are fully performed. In the event of any judicial or other adversarial proceeding between the parties concerning this Agreement or the other Loan Documents, the prevailing party shall be entitled to recover its attorneys' fees and other costs in addition to any other relief to which it may be entitled.

23.    Governing Law; Time of the Essence. Borrower acknowledges that this Agreement and the other Loan Documents were substantially negotiated in the State of Arizona, this Agreement and the other Loan Documents were executed by Lender in the State of Arizona and delivered by Borrower in the State of Arizona, all payments under the Equipment Notes will be delivered in the State of Arizona and there are substantial contacts between the parties and the transactions contemplated herein and the State of Arizona. For purposes of any action or proceeding arising out of this Agreement or any of the other Loan Documents, the parties hereto hereby expressly submit to the jurisdiction of all federal and state courts located in the State of Arizona and Borrower consents that it may be served with any process or paper by registered mail or by personal service within or without the State of Arizona in accordance with applicable law. Furthermore, Borrower waives and agrees not to assert in any such action, suit or proceeding that it is not personally subject to the jurisdiction of such courts, that the action, suit or proceeding is brought in an inconvenient forum or that venue of the action, suit or proceeding is improper. It is the intent of the parties hereto that all provisions of this Agreement and the Equipment Notes shall be governed by and construed under the laws of the State of Arizona, without giving effect to its principles of conflicts of law. To the extent that a court of competent jurisdiction finds Arizona law inapplicable with respect to any provisions of this Agreement or the Equipment Notes, then, as to those provisions only, the laws of the state(s) where the Collateral is located shall be deemed to apply. Nothing in this Section shall limit or restrict the right of Lender to commence any proceeding in the federal or state courts located in the state(s) in which the Collateral is located to the extent Lender deems such proceeding necessary or advisable to exercise remedies available under this Agreement or the other Loan Documents. Time is of the essence in the payment and performance by Borrower of all of its obligations under this Agreement and the other Loan Documents.

24.    Cross-Default and Cross-Collateralization. Notwithstanding anything to the contrary contained in this Agreement or the other Loan Documents: (a) an Event of Default or a breach or default, after the passage of all applicable notice and cure or grace periods, under any Loan Document or Other Agreement which relates to a loan or sale/leaseback transaction which has not been the subject of a securitization, participation or transfer shall not constitute an Event of Default or a breach or default, as applicable, under any Loan Document or Other Agreement which relates to a loan which has been the subject of a securitization, participation or transfer; (b) an Event of Default or a breach or default, after the passage of all applicable notice and cure or grace periods, under any Loan Document or Other Agreement which relates to a loan which is included in any Loan Pool shall not constitute an Event of Default or a breach or default, as applicable, under any Loan Document or Other Agreement which relates to a loan which is included in any other Loan Pool; (c) the Loan Documents and Other

Contract No. 28039
Property No.

11

Agreements corresponding to the loans in any Loan Pool shall not secure the obligations of any of the Borrower Parties or any Affiliate of any of the Borrower Parties contained in any Loan Document or Other Agreement which does not correspond to a loan in such Loan Pool; and (d) the Loan Documents and Other Agreements which do not correspond to a loan in any Loan Pool shall not secure the obligations of any of the Borrower Parties or any Affiliate of any of the Borrower Parties contained in any Loan Document or Other Agreement which does correspond to a loan in such Loan Pool. For purposes of this Section, the term "Loan Pool" means: (i) in the context of a securitization, any pool or group of loans that are a part of such securitization; (ii) in the context of a transfer, all loans which are sold, transferred or assigned to the same transferee; and (iii) in the context of a participation, all loans as to which participating interests are granted to the same participant.

25.     **Waiver of Jury Trial and Punitive, Consequential, Special and Indirect Damages.** BORROWER AND LENDER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EITHER MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY AND ALL ISSUES PRESENTED IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER OR ITS SUCCESSORS WITH RESPECT TO ANY MATTER ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, ANY OF THE OTHER LOAN DOCUMENTS OR ANY DOCUMENT CONTEMPLATED HEREIN OR RELATED HERETO. THIS WAIVER BY THE PARTIES HERETO OF ANY RIGHT EITHER MAY HAVE TO A TRIAL BY JURY HAS BEEN NEGOTIATED AND IS AN ESSENTIAL ASPECT OF THEIR BARGAIN. FURTHERMORE, BORROWER AND LENDER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EITHER MAY HAVE TO SEEK PUNITIVE, CONSEQUENTIAL, SPECIAL AND INDIRECT DAMAGES FROM THE OTHER AND ANY OF THE OTHER'S AFFILIATES, OFFICERS, DIRECTORS OR EMPLOYEES OR ANY OF THEIR SUCCESSORS WITH RESPECT TO ANY AND ALL ISSUES PRESENTED IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY EITHER PARTY AGAINST THE OTHER OR ANY OF THE OTHER'S AFFILIATES, OFFICERS, DIRECTORS OR EMPLOYEES OR ANY OF THEIR SUCCESSORS WITH RESPECT TO ANY MATTER ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, ANY OF THE OTHER LOAN DOCUMENTS OR ANY DOCUMENT CONTEMPLATED HEREIN OR RELATED HERETO. THE WAIVER BY BORROWER AND LENDER OF ANY RIGHT THEY MAY HAVE TO SEEK PUNITIVE, CONSEQUENTIAL, SPECIAL AND INDIRECT DAMAGES HAS BEEN NEGOTIATED BY THE PARTIES HERETO AND IS AN ESSENTIAL ASPECT OF THEIR BARGAIN.

26.     Disclosure Authorization.    Borrower authorizes Lender and its employees, officers, agents, representatives and designees to:

(a)     discuss the affairs, finances and accounts of Borrower, any guarantor of the Equipment Loan, any Affiliate of Borrower, the other Borrower Parties and any operator or lessee of the Premises with Franchisor and the employees, officers, agents and representatives of Franchisor;

(b)     obtain from, and disclose to, Franchisor any information regarding the status of the Franchise Agreement, Borrower, any guarantor of the Equipment Loan, any Affiliate of Borrower, the other Borrower Parties, any operator or lessee of the Premises or the business operations at the Premises, including, without limitation, financial information about Borrower, any guarantor of the Equipment Loan, any Affiliate of Borrower, the other Borrower Parties, any operator or lessee of the Premises or the business operations at the Premises;

(c)     distribute to, or publish for the use by, any third-parties for statistical analysis purposes the unit-level or corporate level operating results for the Premises, Borrower, any guarantor of the Equipment Loan, any Affiliate of Borrower, any of the other Borrower Parties or any operator or lessee of the Premises prepared by Lender from financial statements obtained from Borrower; and

(d)     obtain personal credit reports, business credit reports or asset reports, as applicable, with respect to Borrower, any guarantor of the Equipment Loan, any Affiliate of Borrower, any of the other Borrower Parties or any operator or lessee of the Premises.

Contract No. 28039
Property No.

12

27.    Corporate Fixed Charge Coverage Covenant. Until such time as all of Borrower's obligations under the Equipment Note and the other Loan Documents are paid, satisfied and discharged in full, Borrower shall maintain a Corporate Fixed Charge Coverage Ratio of at least 1.20:1, as determined as of Borrower's fiscal year end. For purposes of this Section, the term "Corporate Fixed Charge Coverage Ratio" shall mean with respect to the twelve month period of time immediately preceding the date of determination, the ratio calculated for such period of time, each as determined in accordance with GAAP, of (a) the sum of net income, depreciation and amortization, interest expense, income taxes, and operating lease expense, plus or minus other non-cash adjustments or non-recurring items (as allowed by Lender), plus or minus changes in officer or shareholders loans and dividends or distributions not otherwise expensed on the Borrower's income statement to (b) the sum of operating lease expense, principal payments of long term debt, maturities of all capital leases and interest expense (excluding non-cash interest expense and amortization of non-cash financing expenses).

28.    Patriot Act Provisions. (a) The following terms shall have the meanings specified for this Section: "Anti-Money Laundering Laws" means all applicable laws, regulations and government guidance on the prevention and detection of money laundering, including, without limitation, 18 U.S.C. § § 1956 and 1957, and the BSA; "BSA" means the Bank Secrecy Act (31 U.S.C. § § 5311 et. seq.), and its implementing regulations, Title 31 Part 103 of the U.S. Code of Federal Regulations; "Entity" means any entity that is not a natural person; and "OFAC Laws and Regulations" means Executive Order 13224 issued by the President of the United States of America, the Terrorism Sanctions Regulations (Title 31 Part 595 of the U.S. Code of Federal Regulations), the Terrorism List Governments Sanctions Regulations (Title 31 Part 596 of the U.S. Code of Federal Regulations), the Foreign Terrorist Organizations Sanctions Regulations (Title 31 Part 597 of the U.S. Code of Federal Regulations), and the Cuban Assets Control Regulations (Title 31 Part 515 of the U.S. Code of Federal Regulations), and all other present and future federal, state and local laws, ordinances, regulations, policies, lists (including, without limitation, the Specially Designated Nationals and Blocked Persons List) and any other requirements of any Governmental Authority (including, without limitation, the United States Department of the Treasury Office of Foreign Assets Control) addressing, relating to, or attempting to eliminate, terrorist acts and acts of war, each as hereafter supplemented, amended or modified from time to time, and the present and future rules, regulations and guidance documents promulgated under any of the foregoing, or under similar laws, ordinances, regulations, policies or requirements of other states or localities.

(b) Borrower represents and warrants to Lender as of the date of this Agreement and the Closing Date as follows: (i) none of the Borrower Parties, and no individual or entity owning directly or indirectly any interest in any of the Borrower Parties, is an individual or entity whose property or interests are subject to being blocked under any of the OFAC Laws and Regulations or is otherwise in violation of any of the OFAC Laws and Regulations; (ii) Borrower has taken all reasonable measures, in accordance with all applicable Anti-Money Laundering Laws, with respect to each holder of a direct or indirect interest in the Borrower Parties, to assure that funds invested by such holders in the Borrower Parties are derived from legal sources; (iii) to Borrower's knowledge after making due inquiry, neither any of the Borrower Parties nor any holder of a direct or indirect interest in the Borrower Parties (A) is under investigation by any Governmental Authority for, or has been charged with, or convicted of, any violation of any Anti-Money Laundering Laws, or drug trafficking, terrorist-related activities or other money laundering predicated crimes or a violation of the BSA, (B) has been assessed civil penalties under these or related laws, or (C) has had any of its funds seized or forfeited in an action under these or related laws; and (iv) Borrower has taken reasonable steps, consistent with industry practice for comparable organizations and in any event as required by law, to ensure that the Borrower Parties are and shall be in compliance with all (A) Anti-Money Laundering Laws and (B) OFAC Laws and Regulations.

(c) Borrower covenants to Lender from and after the date of this Agreement and until all of the Obligations are satisfied in full, as follows: (i) Borrower shall require, and shall take reasonable measures to comply with the requirement, that no individual or entity owning directly or indirectly any interest in any

Contract No. 28039
Property No.

13

of the Borrower Parties is an individual or entity whose property or interests are subject to being blocked under any of the OFAC Laws and Regulations or is otherwise in violation of any of the OFAC Laws and Regulations; (ii) the Borrower Parties shall at all times comply with the OFAC Laws and Regulations and Anti-Money Laundering Laws; (iii) Borrower shall immediately notify Lender in writing if any individual or entity owning directly or indirectly any interest in any of the Borrower Parties or any director, officer, member, manager or partner of any of such holders is an individual or entity whose property or interests are subject to being blocked under any of the OFAC Laws and Regulations or is otherwise in violation of any of the OFAC Laws and Regulations, or is under investigation by any governmental entity for, or has been charged with, or convicted of, drug trafficking, terrorist-related activities or any violation of Anti-Money Laundering Laws, has been assessed civil penalties under these or related laws, or has had funds seized or forfeited in an action under these or related laws; (iv) without limiting the terms and conditions of Section 13 of this Agreement, Borrower agrees that, from and after the date of this Agreement and until all of the Obligations are satisfied in full, no interest in any of the Borrower Parties, or in any individual or person owning directly or indirectly any interest in any of the Borrower Parties, shall be transferred, assigned or conveyed to any individual or person whose property or interests are subject to being blocked under any of the OFAC Laws and Regulations or who is in violation of any of the OFAC Laws and Regulations, and any such transfer, assignment or conveyance shall not be effective until the transferee has provided written certification to Borrower and Lender that (A) the transferee or any person who owns directly or indirectly any interest in transferee, is not an individual or entity whose property or interests are subject to being blocked under any of the OFAC Laws and Regulations or is otherwise in violation of the OFAC Laws and Regulations, and (B) the transferee has taken reasonable measures to assure that any individual or entity who owns directly or indirectly any interest in transferee, is not an individual or entity whose property or interests are subject to being blocked under any of the OFAC Laws and Regulations or is otherwise in violation of the OFAC Laws and Regulations.

[BALANCE OF THIS PAGE INTENTIONALLY LEFT BLANK]

GEFF:

**GE CAPITAL FRANCHISE FINANCE
CORPORATION,** a Delaware corporation

By _____
Printed Name: _____
Its: _____

BORROWER:

**SERIOUS PIZZA INC,**
an Illinois corporation

By _____
Printed Name: Paul Chilcote
Its: President

Contract No. 28039
GEFF No. 8004-2073 through 8004-2083

14

**EXHIBIT A**

**PREMISES**

2205 E. Oakland Ave, Bloomington, IL  61701

305 W. Beaufort, Normal, IL 61761

1135 W. Wood St., Suite 2, Decatur, IL 62522-2874

1948 E. El Dorado, Decatur, IL  62521-2128

3030 N. Woodford St., Decatur, IL  62526-2832

425 N. Western Ave, Peoria, IL  61606-1653

5040 N. Big Hollow Rd, Suite 2, Peoria, IL  61615-3542

11 E. Jackson St., Morton, IL  61550-1621

3320 N. Prospect Rd., Peoria, IL  61603-1510

667 Lincoln Ave, Charleston, IL  61920-3089

1001 Charleston Ave, Mattoon, IL  61938-4126

E-FILED
Tuesday, 29 July, 2008  04:06:38 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT B

## UNCONDITIONAL GUARANTY OF PAYMENT AND PERFORMANCE (EQUIPMENT)

Dated as of 7/1/05

For valuable consideration, the receipt of which is hereby acknowledged, **PAUL CHILCOTE** ("Guarantor") unconditionally, absolutely and irrevocably: (i) guarantees and promises to pay to **GE CAPITAL FRANCHISE FINANCE CORPORATION**, a Delaware corporation ("GEFF"), or order, any and all amounts, costs, fees, expenses and charges of any kind or type whatsoever, which may or at any time be due to GEFF by **SERIOUS PIZZA INC**, an Illinois corporation ("Borrower") pursuant to the Loan Documents (as defined in the Loan and Security Agreement dated as of the date hereof between Borrower and GEFF (the "Loan Agreement"), any other document, agreement, instrument or certificate contemplated by the Loan Documents, and any amendments to any of the Loan Documents or any such other document, agreement, instrument or certificate (collectively, the "Documents"); and (ii) guarantee the truthfulness and accuracy of all representations, warranties and certifications of Borrower, the satisfaction of all conditions by Borrower and the full and timely performance of all obligations to be performed by Borrower, under or pursuant to the Documents (the matters which are guaranteed pursuant to this Guaranty are hereinafter collectively referred to as the "Obligations"). The obligations of Guarantor under this Guaranty are primary, and independent of the obligations of Borrower, and a separate action or actions may be brought and executed against Guarantor, whether or not such action is brought against Borrower and whether or not Borrower be joined in such action or actions. Capitalized terms used but not defined herein shall have the meanings given to such terms in the Loan Agreement.

This is an absolute and unconditional guaranty of payment and performance and not of collection. Guarantor unconditionally and irrevocably: (a) waives any requirement that GEFF first make demand upon, or seek to enforce or exhaust remedies against, Borrower or any other person or entity or any of the collateral or property of Borrower or such other person or entity before demanding payment from, or seeking to enforce this Guaranty against Guarantor; (b) waives and agrees not to assert any and all rights, benefits and defenses which might otherwise be available under the provisions of applicable law that might operate to limit Guarantor's liability under, or the enforcement of, this Guaranty; (c) agrees that this Guaranty shall remain in full effect without regard to, and shall not be affected or impaired by, any invalidity, irregularity or unenforceability in whole or in part of any of the Documents, or any limitation of the liability of Borrower or Guarantor thereunder, or any limitation on the method or terms of payment thereunder which may now or hereafter be caused or imposed in any manner whatsoever; (d) waives any right to participate in any security now or hereafter held by GEFF or in any claim or remedy of GEFF or any other person against Borrower with respect to the Obligations; (e) waives any statute of limitations affecting Guarantor's liability hereunder; (f) waives all principles and provisions of law which conflict with the terms of this Guaranty; and (g) waives diligence, presentment, protest, demand for performance, notice of nonperformance, notice of intent to accelerate, notice of acceleration, notice of protest, notice of dishonor, notice of execution of any Documents, notice of extension, renewal, alteration or amendment, notice of acceptance of this Guaranty, notice of defaults under any of the Documents and all other notices whatsoever. This Guaranty is a continuing guaranty, and the obligations, undertakings and conditions to be performed or observed by Guarantor under this Guaranty shall not be affected or impaired by reason of the happening from time to time of the following with respect to the Documents, all without notice to, or the further consent of, any Guarantor: (i) the waiver by GEFF of the observance or performance by Borrower, Guarantor of any of the obligations, undertakings, conditions or other provisions contained in any of the Documents, except to the extent of such waiver; (ii) the extension, in whole or in part, of the time for payment of any amount owing or payable under the Documents; (iii) the modification or amendment (whether material or otherwise) of any of the obligations of Borrower under, or any other provisions of, any of the Documents, except to the extent of such modification or amendment; (iv) the taking or the omission of any of the actions referred to in any of the Documents (including, without limitation, the giving of any consent referred to therein); (v) any failure, omission, delay or lack on the part of GEFF to enforce, assert or exercise any provision of the Documents, including any right, power or remedy conferred on GEFF in any of the Documents or any action on the part of GEFF granting indulgence or extension in any form; (vi) the assignment to or assumption by any third party of any or all of the rights or obligations of Borrower under all or any of the Documents; (vii) the release or discharge of Borrower from the performance or observance of any obligation, undertaking or condition to be performed by Borrower under any of the Documents by operation of law, including any rejection or disaffirmance of any of the Documents in any bankruptcy or similar proceedings; (viii) the receipt and acceptance by GEFF or any other person or entity of notes, checks or other instruments for the payment of money and extensions and renewals thereof; (ix) any action, inaction or election of

Contract No. 28039
GEFF No. 8004-2073 through 8004-2083

1

remedies by GEFF which results in any impairment or destruction of any subrogation rights of Guarantor, or any rights of Guarantor to proceed against any other person or entity for reimbursement; (x) any setoff, defense, counterclaim, abatement, recoupment, reduction, change in law or any other event or circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor, indemnitor or surety under the laws of the State of Arizona, the state(s) in which the Equipment is located or any other jurisdiction; and (xi) the termination or renewal of any of the Obligations or any other provision thereof.

This Guaranty shall continue in full force and effect until all of the Obligations are duly, finally and permanently paid, performed and discharged and are not subject to any right of reborrowing or extension by Borrower, and GEFF gives Guarantor written notice of the full and final satisfaction of the Obligations. The Obligations shall not be considered fully paid, performed and discharged unless and until all payments by Borrower to GEFF are no longer subject to any right on the part of any person whomsoever, including but not limited to Borrower, Borrower as a debtor-in-possession or any trustee in bankruptcy, to disgorge such payments or seek to recoup the amount of such payments or any part thereof. This Guaranty shall remain in full force and effect and continue to be effective in the event that (i) any petition is filed by or against Borrower or any Guarantor for liquidation or reorganization, including, without limitation, under Title 11 of the United States Code, 11 U.S.C. Sec. 101 *et seq.* (the "Code"), (ii) Borrower or Guarantor becomes insolvent or makes an assignment for the benefit of creditors or (iii) a receiver or trustee is appointed for all or any significant part of Borrower's or Guarantor's assets. This Guaranty shall continue to be effective or be reinstated, as applicable, if at any time payment and performance of the Obligations, or any part thereof, is, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by GEFF, whether as a "voidable preference", "fraudulent conveyance" or otherwise, all as though such payment or performance had not been made. In the event that any payment of the Obligations, or any part thereof, is rescinded, reduced, restored or returned, the Obligations shall be reinstated and deemed reduced only by such amount paid to GEFF and not so rescinded, reduced, restored or returned.

Guarantor shall not have any right of subrogation, indemnity or reimbursement nor hold any other claim against Borrower, and does hereby release Borrower from any and all claims by Guarantor now or hereafter arising against Borrower. Notwithstanding the preceding sentence, in the event that Guarantor shall have any claims against Borrower, any indebtedness of Borrower now or hereafter held by any or all Guarantor is hereby subordinated to the indebtedness of Borrower to GEFF. Any such indebtedness of Borrower to Guarantor, if GEFF so requests, shall be collected, enforced and received by Guarantor as trustee for GEFF and be paid over to GEFF on account of the Obligations, but without reducing or affecting in any manner the liability of Guarantor under the other provisions of this Guaranty.

In addition to the amounts guaranteed under this Guaranty, Guarantor agrees to pay (i) all of GEFF's attorneys' fees and other costs and expenses which may be incurred by GEFF in the enforcement of this Guaranty and (ii) interest (including postpetition interest to the extent a petition is filed by or against Borrower under the Code) at the Default Rate (as defined in the Equipment Note) on any Obligations not paid when due. Guarantor hereby agrees to indemnify and hold harmless GEFF for, from and against any loss, cause of action, claim, cost, expense or fee, including but not limited to attorney's fees and court costs, suffered or occasioned by (1) the failure of Borrower to satisfy its obligations under the Documents, or (2) any disclosures of information, financial or otherwise, (x) made by GEFF or GEFF's employees, officers, agents and designees to any third party as contemplated by the Loan Agreement, or (y) obtained from any credit reporting agency with respect to Guarantor, Borrower, any other guarantor of the Loan, any Affiliate (as defined in the Loan Agreement) of Borrower, any of the other Borrower Parties (as defined in the Loan Agreement) or any operator or lessee of the Premises (as defined in the Loan Agreement). The agreement to indemnify GEFF contained in this paragraph shall be enforceable notwithstanding the invalidity or unenforceability of the Documents or any of them or the invalidity or unenforceability of any other paragraph contained in this Guaranty. All moneys available to GEFF for application in payment or reduction of the liabilities of Borrower under the Documents may be applied by GEFF to the payment or reduction of such liabilities of Borrower, in such manner, in such amounts and at such time or times as GEFF may elect.

This Guaranty is delivered in the State of Arizona, and it is the intent of Guarantor and GEFF that this Guaranty shall be deemed to be a contract made under and governed by the internal laws of the State of Arizona,

Contract No. 28039
GEFF No. 8004-2073 through 8004-2083

2

without regard to its principles of conflicts of law. For purposes of any action or proceeding involving this Guaranty, Guarantor submits to the jurisdiction of all federal and state courts located in the State of Arizona and consents that Guarantor may be served with any process or paper by registered mail or by personal service within or without the State of Arizona in accordance with applicable law. Furthermore, Guarantor waive and agree not to assert in any such action, suit or proceeding that they are not personally subject to the jurisdiction of such courts, that the action, suit or proceeding is brought in an inconvenient forum or that venue of the action, suit or proceeding is improper. Nothing contained in this section shall limit or restrict the right of GEFF to commence any proceeding in the federal or state courts located in the state(s) in which the Equipment is located or where Guarantor resides to the extent GEFF deems such proceeding necessary or advisable to exercise remedies available under the Documents.

Guarantor authorizes GEFF and its employees, officers, agents, representatives and designees to: (i) distribute to, or publish for the use by, any third-parties for statistical analysis purposes the unit-level or corporate level operating results for the Premises, Guarantor, Borrower, any Affiliate of Borrower, any of the other Borrower Parties or any operator or lessee of the Premises prepared by GEFF from financial statements obtained from Borrower; and (ii) obtain personal credit reports, business credit reports or asset reports, as applicable, with respect to Guarantor, Borrower, any other guarantor of the Loan, any Affiliate of Borrower, any of the other Borrower Parties or any operator or lessee of the Premises.

All of GEFF's rights and remedies under the Documents and this Guaranty are intended to be distinct, separate and cumulative and no such right and remedy is intended to be in exclusion of or a waiver of any of the others. If under applicable law, GEFF proceeds to realize benefits under any Document granting GEFF a lien upon any collateral pledged under such Document, either by judicial foreclosure or by non-judicial sale or enforcement, GEFF may, at is sole option, determine which of such remedies or rights it may pursue without affecting any of such rights and remedies under this Guaranty. If, in the exercise of any of its rights and remedies, GEFF shall forfeit any of its rights or remedies, including its right to enter a deficiency judgment against Borrower or any pledgor, whether because of any applicable laws pertaining to "election of remedies" or the like, Guarantor hereby consents to such action by GEFF and waives any claim based upon such action. Any election of remedies which results in the denial or impairment of the right of GEFF to seek a deficiency judgment against Borrower or any pledgor shall not impair one guarantor Guarantor's obligation to pay the full amount of the Obligations. In the event GEFF shall bid at any foreclosure or trustee's sale or at any private or public sale permitted by law or under the Documents, GEFF may bid all or less than the amount of the Obligations and the amount of such bid need not be paid by GEFF but shall be credited against the Obligations. The amount of the successful bid at any such sale shall be conclusively deemed to be the fair market value of the collateral and the difference between such bid amount and the remaining balance of the Obligations shall be conclusively deemed to be the amount of the Obligations guaranteed under this Guaranty, notwithstanding that any present or future law or court decision or ruling may have the effect of reducing the amount of any deficiency claim to which GEFF might otherwise be entitled but for such bidding at any such sale.

This Guaranty is solely for the benefit of GEFF, its successors and assigns and is not intended to nor shall it be deemed to be for the benefit of any third party, including, without limitation, Borrower. This Guaranty and all obligations of Guarantor hereunder shall be binding upon the successors and assigns of Guarantor (including, a debtor-in-possession on behalf of such Guarantor) and shall, together with the rights and remedies of GEFF, hereunder, inure to the benefit of GEFF, all future holders of any instrument evidencing any of the Obligations and its successor and assigns. No sales, participations, assignments, transfers or other dispositions of any agreement governing or instrument evidencing the Obligations or any portion thereof or interest therein shall in any manner affect the rights of GEFF or its successors and assigns hereunder. Guarantor may not assign, sell, hypothecate or otherwise transfer any interest in or obligations under this Guaranty. If any provision of this Guaranty is unenforceable, the enforceability of the other provisions shall not be affected and they shall remain in full force and effect. Guarantor agrees to take such action and to sign such other documents as may be appropriate to carry out the intent of this Guaranty. This Guaranty may be executed in one or more counterparts, each of which shall be deemed an original.

**GEFF, BY ACCEPTING THIS GUARANTY, AND THE GUARANTOR HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT THEY MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY AND ALL ISSUES PRESENTED IN ANY ACTION, PROCEEDING, CLAIM OR**

COUNTERCLAIM BROUGHT BY GEFF OR THE GUARANTOR AGAINST THE OTHER OR THEIR SUCCESSORS WITH RESPECT TO ANY MATTER ARISING OUT OF OR IN CONNECTION WITH THIS GUARANTY, THE RELATIONSHIP OF GEFF, BORROWER OR THE GUARANTOR, BORROWER'S USE OR OCCUPANCY OF THE PREMISES, OR ANY CLAIM FOR INJURY OR DAMAGE, OR ANY EMERGENCY OR STATUTORY REMEDY. THIS WAIVER BY GEFF AND THE GUARANTOR OF ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY HAS BEEN NEGOTIATED AND IS A MATERIAL INDUCEMENT FOR GEFF ACCEPTING THIS GUARANTY. FURTHERMORE, THE GUARANTOR AND GEFF HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT THEY MAY HAVE TO SEEK PUNITIVE, CONSEQUENTIAL, SPECIAL AND INDIRECT DAMAGES FROM THE OTHER AND ANY OF THE OTHER'S AFFILIATES, OFFICERS, DIRECTORS OR EMPLOYEES OR ANY OF THEIR SUCCESSORS WITH RESPECT TO ANY AND ALL ISSUES PRESENTED IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY THE GUARANTOR AGAINST THE OTHER OR ANY OF THEIR AFFILIATES, OFFICERS, DIRECTORS OR EMPLOYEES OR ANY OF THEIR SUCCESSORS WITH RESPECT TO ANY MATTER ARISING OUT OF OR IN CONNECTION WITH THIS GUARANTY OR ANY DOCUMENTS CONTEMPLATED HEREIN OR RELATED HERETO. THE WAIVER BY THE GEFF AND GUARANTOR OF ANY RIGHT THEY MAY HAVE TO SEEK PUNITIVE, CONSEQUENTIAL, SPECIAL AND INDIRECT DAMAGES HAS BEEN NEGOTIATED AND IS AN ESSENTIAL ASPECT OF THEIR BARGAIN.

Contract No. 28039
GEFF No. 8004-2073 through 8004-2083

IN WITNESS WHEREOF, the undersigned Guarantor has executed this Guaranty effective as of the date first set forth above.

GUARANTOR:

Paul Chilcote
***Guarantor Address***
Phone: ***Guarantor Phone***
Facsimile: ***Guarantor Fax***

Contract No. 28039
GEFF No. 8004-2073 through 8004-2083

STATE OF *Hilton Illinois*

COUNTY OF *McLean*

) SS.
)

The foregoing instrument was acknowledged before me this *10* day of *June*, *2005* by Paul Chilcote.

_____
Notary Public

My Commission Expires:

_____*8/11/2008*_____

```
"OFFICIAL SEAL"
WILLONDA C. HERROD
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXP. 08/11/2008
```

Contract No. 28039
GEFF No. 8004-2073 through 8004-2083

JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

E-FILED
Tuesday, 29 July, 2008 04:06:51 PM
Clerk, U.S. District Court, ILCD

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

## DEFENDANTS

**(b)** County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff

☐ 2 U.S. Government Defendant

☐ 3 Federal Question (U.S. Government Not a Party)

☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 190 Other Contract | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - Alien Detainee | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

☐ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (**Do not cite jurisdictional statutes unless diversity**):

Brief description of cause:

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER F.R.C.P. 23

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions): JUDGE _____  DOCKET NUMBER _____

DATE _____  SIGNATURE OF ATTORNEY OF RECORD _____

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.    (a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.    Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

**III.    Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.    Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.    Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

**VI.    Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.**    Example:    U.S. Civil Statute: <u>47 USC 553</u>
Brief Description: <u>Unauthorized reception of cable service</u>

**VII.    Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.    Related Cases.** This section of the JS 44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.